NIMMO (BELL v.). See Case No. 1.258.
NIMMON (BELL v.). See Case No. 1,259.

---

## Case No. 10,267.

### The NIMROD.

[1 Ware (9) 1.] .

District Court, D. Maine. Sept. Term, 1822.

SEAMEN—JETTISON OF CARGO WITHOUT AUTHORITY—DISCHARGE IN FOREIGN PORT—JUSTIFICATION—WAGES—RIGHT TO BE CURED—MEDICINE CHEST.

1. The crew of a vessel are not authorized to make a jettison of any part of the cargo, in a case of distress, without the order of the master.
[Cited in Jay v. Almy, Case No. 7,236.]

2. If the master alleges, as a justification for dismissing a man in a foreign country, that he was a dangerous man, he must show that the danger of bringing him back would be such as might reasonably affect the mind of a man of ordinary firmness.
[Cited in Jay v. Almy. Case No. 7.236; Jordan v. Williams. Id. 7.528: Tingle, v. Tucker. Id. 14.057; Worth v. The Lioness No. 2, 3 Fed. 925.]

3. If a seaman is discharged abroad. without sufficient cause, he will be entitled to wages until the termination of his voyage.
[Cited in Jay v. Almy, Case No. 7,236; The Paul Revere, 10 Fed. 158.]

4. If the master punishes the misconduct of a seaman, by imprisonment. he cannot deduct from his wages the prison expenses.

5. A seaman falling sick during the voyage, is, by the general maritime law. entitled to be cured at the expense of the vessel.
[Cited in The Ben Flint, Case No. 1,299; Longstreet v. The R. R. Springer, 4 Fed. 672.]

6. The act of congress of July 20, 1790 [1 Stat. 134], exempts the vessel from the charges for medical advice and attendance. provided there is a medicine chest on board. with suitable medicines and directions for using them. But before the owner can claim the exemption. he must prove that such a medicine chest was provided.

This was a suit for mariner's wages. The respondent, in his answer, relied upon a defensive allegation, asserting that the wages of the libellant were forfeited by misconduct on his part, and also claimed to deduct from his wages certain hospital and prison expenses, incurred during the voyage.

C. S. Daveis, for libellant.
N. Kinsman, for respondent.

WARE, District Judge. The libellant shipped, in this case, on board the Nimrod, at Portland, March 1, 1822, for a voyage to Guadaloupe, or one or more ports in the

¹ [Reported by Hon. Ashur Ware, District Judge.]

West Indies, and back to her port of discharge in the United States, and thence to Portland, for wages at the rate of thirteen dollars a month. Soon after the Nimrod left Portland, she sprang aleak, and continued leaking more or less until her arrival off Bermuda. The wind being ahead, so that she could not make a harbor there, as the master [Alden] intended, she bore away for the West Indies. A day or two after this, the weather having become boisterous, and the leak increasing, the master called a council of the crew, and it was determined, for the common safety, to throw over a part of the deck-load. The master directed the crew to save of the deck-load a house frame and some hoop poles. The jettison was made according to the master's direction, and a small leak was found and stopped. Thus far every thing appears to have been done regularly, and to the master's satisfaction. But the principal leak was not discovered, and another consultation was held to determine what further should be done, at which it was resolved to throw over the rest of the deck-load. It is not quite certain whether the master was, or was not, present at this consultation. One witness says that he was, and assented to the determination of the crew; another says that he was not; but all the witnesses agree that about this time he went below, and continued below the whole or nearly the whole time that the crew were employed in throwing over the rest of the deck-load. When he returned on deck, he appeared to be much dissatisfied with what had been done; and from the whole testimony, though in part contradictory, and otherwise not very clear, it seems probable that at the time of the second consultation he was below, or at any rate, that he did not voluntarily consent to the sacrifice of the residue of the deck-load. After the second jettison the principal leak was found and stopped, and the brig arrived in safety at Point Petre. There the crew signed a protest against the vessel as unseaworthy. A survey was called. and she was decided to be seaworthy, with repairs.

The misconduct of Jane, in connection with the rest of the crew, in the business of the second jettison, as well as in the protest, are relied upon as working a forfeiture of all claim for wages. I can see no ground for inflicting a forfeiture of wages, on account of the protest. If seamen wantonly and maliciously make a protest against a vessel and this occasions expense to the owner, he may be entitled to indemnify himself by making a deduction from their wages. But I know of no authority for visiting such an act by an absolute forfeiture of wages; by way of penalty. without reference to the amount of damages it may have occasioned. the owner. In the present case, however,. it does not appear that the protest was malicious or wanton on the part of the seamen. It is certain that the vessel leaked

badly on the outward passage. Part of the cargo, on account of the bad state of the vessel, and tempestuous weather, was, on the admission of the master, necessarily sacrificed for the common safety, and it cannot be deemed a very unreasonable act on the part of the seamen to insist that the vessel should be examined, before they trusted their lives in it in the return voyage. The survey also proves that repairs were necessary to render her seaworthy. The protest, therefore, so far from furnishing grounds for inflicting a forfeiture, will not, in my opinion, justify a deduction from the wages of the crew. The other charge is of a more grave character, and deserves a more careful examination. In times of peril, the seamen are bound to exert themselves to the utmost of their strength to save the ship and cargo, and they cannot excuse themselves from this obligation because the ship proves, in the course of the voyage, to be unseaworthy. It is, indeed, the duty of the owners to provide a ship that is fit to encounter the perils of the voyage, and if it discovered before sailing that she is not so, the seamen will be justified in refusing to go in her. But it is not unusual for vessels apparently staunch and strong to prove otherwise, after getting to sea, and being tried by rough weather, from some defect which may have escaped notice, without imputing any culpable neglect to the owners. In such a case, the seamen will not be heard in justifying themselves for the sacrifice of any part of the cargo, except in a case of extreme and overruling necessity, by saying that it is the owner's fault, whose duty it was to see that the vessel was tight, staunch, and strong, and fit to encounter the perils of the voyage. They are bound, in such cases, to use their utmost exertions to save the cargo, as well as the ship, and bring them safely into port. And it is in these cases of danger, that a prompt, ready, and cheerful obedience to the orders of the master, is peculiarly a duty on their part.

Now it is charged that at this time the crew were disobedient and mutinous, and that the master was compelled, by a regard for his personal safety, to give up, in some measure, the command of the ship to the mate and crew; that it was in consequence of this disorderly conduct approaching to mutiny, that a part of the deck-load was lost, which might have been saved if the crew had been obedient and done their duty faithfully. If this charge were sustained by the evidence, and it were shown that Jane was an active party in this mutinous conduct, it might be a just cause for inflicting the penalty of a forfeiture of all wages antecedently earned The difficulty of the respondent's case is, that the evidence does not support the statement, in the strong terms in which it is made. In point of fact, no act of disobedience is proved, nor any acts on the part of the crew from which it can be inferred that any exercise of authority on the part of the master would be attended with personal danger, or that if he had remained on deck he might not have retained the entire control and command of his ship, and have saved a part of his deck-load, provided the condition of the vessel and the state of the weather had been such as to render it practicable. The fact of his leaving the deck at that critical time, furnishes an apology for some irregularity on the part of the crew. Indeed, for the libellant, the broad ground is assumed that the crew is authorized, without the consent of the master, to thow over a deck-load, if, in their judgment, the safety of the vessel requires it. I cannot assent to this doctrine in the unqualified terms in which it has been urged at the bar. The only authority relied upon in support of it is Jac. Sea Laws, bk. 4, p. 345, c. 2. He says that "the crew of a vessel, for the common safety, have a right to throw over a part of the lading. This," he adds, "can only be done after a previous consultation, if time and circumstances permit; and the master, if he differ from the crew, has nevertheless a vote." If the sense of the author is preserved in the translation, he seems to support the position of the counsel in its full extent. The only authority which he refers to in support of the doctrine is Emerigon. Now, if we turn to Emerigon, we shall find that, so far from supporting this doctrine, he expressly repudiates it. Valin, in his commentary on the Marine Ordinance (article 15, tit. "Capitaine"), says, that in case of jettison, the master is bound to follow the advice of the crew, or the principal persons of the crew, and that if he acts against it, he will render himself responsible for any damage that may ensue in consequence. Emerigon, commenting on the words of Valin, says that "this doctrine does not appear to be correct. This is not a case in which votes are to be counted and not weighed. The captain is master. He is obliged to consult them, (the text of the ordinance requires it,) but he is not obliged blindly to follow their advice if, in the circumstances, it appears to be bad." Traite Des Assur. c. 12, § 4. And Valin, who had expressed this opinion in the first part of his commentary, returns to the sounder opinion of Emerigon when he comes to treat particularly of jettison. Livre 3, tit. 8, arts. 1, 2. The old marine ordinances are very minute and particular in their directions on this subject. When a jettison becomes necessary for the common safety, they require that the merchants, who in those times generally went with their goods, first be consulted. This also seems to have been required by the Rhodian law. De Jactu, Dig. 14, 2, 2, 1. If they consent, the sacrifice may be made. But if they object, the master may appeal to the crew, or to the principal persons of the crew, and if they agree with him, the

jettison may be made without the consent of the merchants. Jus Navale Rhodiorum, c. 9, 38; Laws of Oleron, arts. 8, 9; Laws of Wisbuy, arts. 29, 21, 38; Consulat de la Mer. c. 99; Vinnius in Peckium, p. 195, note a; Kuricke, Com. in Jus. Marit. Hans. p. 770, tit. 8, § 1; Quaest. Illust. 32, p. 895; Loccenius, de Jur. Marit. lib. 1, cap. 7, §§ 1, 2. This is also the principle adopted by the French law. Ordinance de la Marine, liv. 3, tit. 2, arts. 1, 2; Code de Commerce, art. 410.

Undoubtedly the master, before proceeding to throw overboard any part of his cargo, is bound in common prudence, if the case is such as will admit of deliberation, to consult with the most skilful and experienced men of the ship's company, and to allow to their advice all the consideration it merits. But the law gives him the authority, and imposes on him the obligation for the government of the ship. It presumes that his judgment is superior to that of others of the ship's company, and when he consults them, their opinions are, in the language of Emerigon, rather to be weighed than counted. The advice of his crew alone would not, I apprehend, excuse him for a sacrifice which was clearly uncalled for by the danger; nor would it, if he acted against it, render him responsible for a sacrifice which was manifestly required for the common safety. To justify himself, he must prove the necessity, and this will excuse him, whether he follow the advice of the crew or not. This is the doctrine of Emerigon, and is most conformable to the general principles of the maritime law, which attributes to the master the sole authority for the government of the ship, subject to his liability to answer for any abuse of his power, and imposes upon him the sole responsibility. It belongs, then to the master, to determine when a necessity arises for sacrificing part of the cargo for the preservation of the rest. As a general principle the crew have no authority to do this without his orders. What they might be justified in doing in extreme cases, such as were put at the argument, it is unnecessary to decide until those cases occur. The rules of law are not founded on extreme cases, but on common experience—the usual and ordinary course of things. But it is said that this case itself is anomalous, and that the master in going below, and leaving the deck at that time of danger, must be supposed to have left the mate and crew an authority to act according to their own discretion in the emergency of the case. There is certainly great weight in the observation, unless he left because he was intimidated by the mutinous and disorderly conduct of the crew, and from a reasonable fear of personal injury. Though enough appears to show that there was not the best discipline in the ship, and perhaps not entire subordination, I see nothing in the evidence that

threatened any personal danger to the master; and in my opinion, this retirement of the master from the immediate command on deck, does throw upon him the burden of proving that the sacrifice was wanton and unnecessary, before he can insist on a forfeiture, or claim a deduction to be made from the wages of the seamen, on account of the loss. But the evidence certainly does not tend to show that the sacrifice was wanton. It is admitted by the master that the vessel made so much water that it was necessary to throw over part of the deck-load. After that was done, a small leak was found and stopped. But the weather continued boisterous, and the principal leak remained. The vessel continued to make so much water that the men were kept the principal part of the time at the pumps. Whether it would have been in their power to keep her afloat and carry her safe into port, cannot be known, because the attempt was not made, but the facts are such as to repel the presumption of a wanton sacrifice of the deck-load.

Jane continued on board the Nimrod, after her arrival at Guadaloupe, was sent by the master to the hospital, and for a subsequent alleged offence was imprisoned on shore. The day before the brig sailed on her return voyage, he was taken out of prison by the order of the master, and discharged, he having first engaged Capt. Eaton, of the schooner Monroe, to take him to Portland. The cause assigned by the master for his discharge is, that the crew on the outward passage had been mutinous and refractory, and that he considered it unsafe to return with the same crew. He applied to the American commercial agent, by whose order two of his crew, Tolman and Seaton, were sent home in another vessel. He applied to him also for an order to send home Jane, but he being a foreigner, the agent declined to interfere. If the conduct of the crew had been turbulent and mutinous to that degree as to excite in the mind of the master reasonable fears for his personal safety, this would undoubtedly be a valid reason for their discharge. But it would be a valid cause for the discharge of the guilty only, and not of the innocent; of those who were the cause of the danger, and not of those from whom nothing was to be apprehended. It may at first seem harsh to say that the master, who has most at stake, shall not be permitted to exercise his own judgment in a case of this kind, without control. But there are two parties to the contract, and the seamen have their rights as well as the master. If the simple allegation of the master, that a seaman was a dangerous man, was sufficient to justify his discharge, it would always be in the power of a master to punish a seaman, on any occasion, for imaginary as well as real faults. When he assigns, in a court of justice, this as a reason for setting aside the obligation of a contract, it is the duty of the court to look into the grounds of

his apprehension. It is not the vain fear, hominis cujusdam meticulosi, that will justify the master in dissolving the contract. It must be such a fear as may be supposed to affect the mind of a man of ordinary firmness. Had, then, the conduct of Jane been so distinguished for insubordination and violence as to furnish reasonable apprehension of danger from him, if he returned in the same vessel? It is here to be remarked. that sailors, from the nature of their employment, acquire habits that are somewhat peculiar. Their occupation exposes them to hardships and privations, and accustoms them to dangers; and while it trains them up to habits of intrepid courage, generates also those faults of character which are apt to be associated with fearlessness of personal danger in minds somewhat rude and undisciplined by education, roughness and impetuosity of manners, and hasty and choleric tempers. We must take them as they are, and compound for their bad by their good qualities. It would be unreasonable to expect from men bred on the stormy element, upon which they live, that subdued and respectful tone of manners that persons in a similar rank in life exhibit, who are daily accustomed to witness the restraint and decorum of manners that prevail in a very different kind of society. They are subject to the orders of the master, and are bound to observe a respectful deportment. But they are engaged in a rude and troubled service, and masters do not always very scrupulously measure the words in which their commands are given, and if orders are sometimes given in an overcharged manner, it is not surprising if the answers should have something of the same coloring. Public policy, as well as strict justice, requires that these defects of temper and manners, which naturally, if not necessarily, arise out of the circumstances of their life. should be looked upon with indulgence, and that every hasty word or imprudent act should not be seized upon as a pretext for inflicting forfeitures. But at the same time, when a disposition of undoubted malignity, and a spirit of dangerous insubordination appears, it should be repressed with exemplary severity. And this is the spirit of the maritime law, founded on the ancient and immemorial usages of the sea. Mutiny is punished with death, but very disorderly conduct, not a great deal short of mutiny, when it proceeds from the effervescence of sudden passion, and does not proceed from a disposition radically depraved and corrupt, is easily forgiven on repentance, a return to duty, and tender of amends. The spirit of the law is accommodated to the character of the sailor, facilis irasci tamen ut placabilis esset. Thorn v. White [Case No. 13,989]; Relf v. The Maria [Id. 11,692]; The Exeter, 2 C. Rob. Adm. 261; Black v. The Louisiana [Case No. 1,461]; Dixon v. The Cyrus [Id. 3,930].

Admitting that there was as much insubordination in the crew as is alleged, and it is certain that there was considerable, Jane, although he may not have been free from blame, is clearly shown not to be one of the most turbulent. The testimony distinctly points out Tolman and Seaton as being the two most disorderly spirits, and it is evident that from them the principal, if not the whole of the trouble arose. It is from them that the threatening language is heard, and they appear to be the prominent actors in all the difficulties that arose; and they seem silently to have acquiesced in the justice of their discharge, for they make no claim for wages. Jane, on the other hand, was at this time laboring under indisposition; he was excused by the master from the most laborious part of his duty, and by his order was, on the arrival of the vessel at Guadaloupe, sent to the hospital as an invalid. He is not to be made responsible for the misdeeds of others. Looking at the whole evidence, my opinion is, that a justifiable cause for his discharge is not made out. If a mariner is discharged without just cause, he may follow the ship home, and recover full wages to the prosperous termination of the voyage. Laws of Oleron, art. 12; Laws of Wisbuy, art. 25; Consulat de la Mer. c. 267; Whitton v. The Commerce [Case No. 17,604].

Two charges are claimed by the master to be deducted from the libellant's wages. The first is the prison charges, while he was, by the master's procurement, confined on shore: The master has an undoubted right, for the purpose of maintaining order and discipline on board his ship, to punish the misconduct of the seamen in a proper manner. Whether he is authorized, for this purpose, to imprison them in foreign jails, except in very peculiar cases, is at least a matter of doubt. If a seaman has committed a crime of too aggravated a character for the master to punish, he will be justified in securing him in jail until he can be sent home for trial; and perhaps in other cases, when a seaman exhibits a temper particularly ungovernable, he may be authorized to resort to such means for subduing his obstinacy, and reducing him to obedience. But if he chooses to punish a seaman by imprisonment in a foreign jail, he cannot inflict a second punishment by charging the prison expenses upon the seaman. 1 Pet. Adm. 175, 176, note. This deduction is therefore disallowed. The other charge, for which the master claims to make a deduction from the wages of the libellant, is the expenses paid for him during his sickness in the hospital. By the general maritime law, if a seaman falls sick during the voyage, he is to be cured at the expense of the vessel. Laws of Oleron, art. 7; Laws of Wisbuy, art. 19; Laws of the Hanse Towns, art. 45; Swift v. The Happy Return [Case No. 13,697]. The law of the United States for the government of seamen in the merchant service has modified the general law in one particular. Act of July 20, 1790, c. 29, § 8. By that act the vessel is exempted

from the charge for medical advice, rendered to a sick or disabled seaman, when there is on board a medicine chest, properly supplied with medicines, and with proper directions for using them. But the statute speaks only of medical advice, and leaves all the other expenses of sickness to fall, where the maritime law had placed them, upon the vessel. If the seaman is put on shore, the expenses of boarding and nursing are still to be borne by the vessel, nor is it exempted from the charge for medical advice, except by a compliance with the statute. To entitle themselves to this exemption, the owners must prove that a medicine chest was on board, furnished with suitable medicines. When a party is relieved from a charge or liability imposed by the general principles of law, upon a condition which is to be performed by himself, he must prove the performance of the condition before he can claim the immunity. In the present case, no evidence is offered to show that there was any medicine chest on board, and this is a fact which cannot be presumed without proof. Consequently, as the owners cannot pretend to claim the exemption under the statute, the court is left to apply to the case the general rule.